Rives, J.
The question of jurisdiction presented by this record is the leading one, and is not without difficulty. It grows exclusively out of the state of the law which is to govern the trial. It is not pretended that *517 -it rests upon facts extraneous to the record, which ought to be pleaded so as to lead to some distinct issue ■of law or fact; but simply that such is the law of the land; that the court is not competent to try the cause, and has no cognizance of it. The challenge of jurisdiction on this score is fundamental. It is so vital, that I presume the objection, however made, whether by suggestion or motion ore ienus, should be at once entertained by the court, and decided upon the law. I cannot conceive of a judge permitting a prosecution to go on before him when satisfied in any way that he was forbidden by statute to try it. The examination of the laws which he administers, and which he is bound to know, is alone sufficient to determine such a question of jurisdiction. But it is otherwise where the jurisdiction is traversed by facts out of the record, such as relate to residence, the venue, &c.,and under our statutes as they were aforetime, the lack of an examining court. Such a defence is appropriate to a plea, as tending by its averments to lead to some distinct issue of law or fact, and admitting of replication and issue. The plea, ■however, in this record is not of that description. It contains but one direct averment,and that is,that “by the law of the land, and the statutes in such case made and provided, this honorable court hath no jurisdiction •for the trial of this indictment.” The protestation I presume can, upon no principle of pleading, stand in the place of an issuable averment. Had it been designed for such an office, the plea would naturally have taken another form, and first denied demand of, or assent to, such trial, by reason whereof this court had no jurisdiction, &c. Even in this form it would have been irrelevant to the indictment. The purport of it could only be, that the accused having been arraigned in the County court had not demanded his trial in the ■Circuit court: whereas, the prosecution in the latter court was not predicated of such a state of facts, but *518 rested on the finding of the indictment in the first instance in this latter court; so that such an averment would have been wholly immaterial, and should not kaye been received. The true point to be made under the circumstances, if the accused had wished to bring his case under the proceedings required by the act of 27th April 1867, would have been to ask to be sent back along with the indictment to the County court, to be tried there. But he refrained from any such request or intimation.
But I do not think this plea is susceptible of this interpretation. Its only intelligible traverse is simply of the jurisdiction under the statutes of the Commonwealth. In truth it is a demurrer, though, in form, a plea. As such it seems to me an anomaly. I have not been able to find a precedent for it; nor have the learned and industrious counsel for the plaintiff in error been able in their researches to find any. blow ought the Commonwealth’s attorney to have been required to take issue upon it? If he had been, had he not the right to put in a general replication; namely, that the court had jurisdiction under the laws of the Commonwealth? If so, we should have had the singular spectacle of a legal enquiry into the actual state of the law, made and pursued under the forms of pleading, and that, too, when it is admitted there were other obvious and more appropriate ways of raising such an issue.
From this view, I conclude the plea was not a proper one in that form; and there was no error in rejecting it. But if I be mistaken in this view, and the plea was a good one and should have been received, is there any substantial error in its rejection to the injury of the prisoner ? It seems to me "not, and for this reason — that the rejection must betaken as tantamount to a finding of the jurisdiction. It was appropriate for the judge on the submission of the plea, seeing that it purported alone to deny the jurisdiction on the grounds *519 of law, to refrain from requiring of the Commonwealth’s attorney the formality of a general replication, and to reject the plea because he was satisfied of his ■ jurisdiction. What advantage would it have been to the prisoner to have had this anomalous issue of “jurisdiction or no jurisdiction” formally joined, provided the judge should find against him upon it ? And shall we now send it back for this replication and issue, when we must know that the court expressed its adverse finding upon such issue by the rejection of the plea? Such a course, I think, would be frivolous. But still, while I deem the plea informal and improper, I am disposed to accord to the prisoner the full benefit of it in this sense; that however informal or irregular, the judge was called upon by it to consider and decide the question of jurisdiction upon'the motion to reject. I also construe its rejection, as a decision against the prisoner on the issue of law which it purported to raise. When this is done, I think, he cannot ask more. The rejection of the plea for matter of form shall not, and ought not to be allowed to put aside this question of jurisdiction. The absolute want of jurisdiction in any form or upon any conditions, is confessedly good cause of arrest of judgment, and the execution of the sentence in this ease, provided no jurisdiction be found, would be properly characterized, as in such event it was indignantly denounced by the concluding counsel for the plaintiff in error, as judicial murder. This important and interesting question, therefore, lays at the threshold of our enquiries; cannot be evaded, and must be solved by us some way or other.
It clearly and solely depends upon the effect and application we shall give to the act of 27th April 1867, Sess. Acts 1866-7, ch. 118, p. 915. It is entitled “ an act to revise and amend the criminal procedure.” It doubtless grew, in a great measure, out of the emancipation of negroes, and the policy of obliterating the *520 pre-existing differences in the mode of prosecuting criminal offences when committed by white or free persons on the one hand, and slaves on the other. Ac^ commences with the repeal of chap. 212 ^0(^e; respecting “proceedings against negroes.” See Code, p. 847. It was doubtless apprehended that the multiplication of criminal trials incident to this policy, if cognizable, as before, in the Circuit courts might abstract too much time from their civil dockets; and this apprehension doubtless led to the transfer of criminal jurisdiction in the main to the County courts. But this transfer did not grow out of any legislative mistrust of these higher courts, but carried with it a distinct recognition of their superior adaptability to such trials, in giving the accused the right, in all the graver enumerated felonies, to demand a trial in them. With this new policy of making all felonies triable, in the first instance, in the County courts, necessarily fell the structure of examining courts; for as they were composed of justices, who also composed the court having original jurisdiction, this preliminary examination .was superseded as cumbersome, and inapplicable to the new order of things. Besides, there was another recommendation of the new system in lessening criminal charges; expediting trials for felony, by ordaining them to be had at “any term” of the County courts, which sit monthly. That such was the main design of this act, is shown by its first clause; at the outset, it repeals without qualification chapter 205, entitled “ of axamining courts,” and chapter 212, entitled “of proceedings against negroes;” and then proceeds to amend and re-enact by the same titles, and numbers, the chapters of the Code (with these two exceptions), from 201 (inclusive) to 211 (inclusive) concerning criminal proceedings ; thereby conforming to these prominent changes, the existing provisions of law in the Code.
This act does not, as is usual, take effect from its *521 passage; but its operation is postponed by its commencing clause to the 1st of July 1867. What effect it is to have upon prosecutions began before its commencement, nowhere appears in the body of the statute, except in sec. 4 of chap. 211, whereby a discretion is given to the Circuit court, in which any prosecution for a misdemeanor or for any felony not punishable with death, pending therein when this act takes effect, to try it or transfer it to the County court, &c., and a peremptory requirement is made of the Circuit courts to retain trials of all pending prosecutions for capital felonies. Sess. Acts 1866-7, p. 945, § 4. What, therefore, was the intent of the legislature in this repeal, must be gathered from the act itself, and the inducements to it. It is to be construed as a whole, and all its provisions must be taken together to arrive at its proper interpretation. The fact that its commencement was appointed for a future day, so far as this enquiry is concerned, in no wise distinguishes it from an act taking effect upon its passage; for it is manifest that at either date the probability would be equal of pending prosecutions at various stages, where the necessity would arise of determining how far they were affected by the repealing law. The design and operation of this postponement was merely to give a proper notice of the introduction of the new system; it can have, therefore, no bearing upon our present enquiry.
There are two views to be taken of this question, either of which would be decisive of it:
I. First. As to the character of the act, whether prospective or retrospective. This, again is a question of legislative intent, for it is not doubted that it is in the competency of the legislature to make its laws retroactive wherever it does not conflict with the sanctity of contracts under the restrictions of the Federal and State constitutions, nor with the prohibition of ex post facto laws; but the courts uniform erly refuse to give statutes *522 a retroactive construction unless the intention is so clear and positive as by no possibility to admit of any other construction. Such a retrospective interpretation is. greatly discouraged, and the desire and effort of the courts is to give a statute a prospective operation only. Sedg. on Stat. and Const. Law, p. 193. It is admitted that the repeal of chap. 205 is absolute; and if it stood alone, there is ample authority and reason for asserting that all proceedings under the old law, would be instantly abrogated and annulled by the repeal. But this, repeal does not stand alone; but is, as I have endeavored to show, part and parcel of a new system of criminal procedure, ordained to go into effect on the 1st July 1867. This repeal is plainly consequent upon the change of the commitment; whereas, under the old law, it was a commitment for examination; now, under the repealing law, it is supplanted and superseded by a commitment for trial. Chapter cciv of the Code, so far as pertains to the process of arrest, bail, examination or trial before the justice, is literally copied and re-enacted down to the 16th section. There occurs the first and fundamental departure from the old procedure. This 16th section is new in its provisions, while the succeeding sections of the same chapter are again copied from the Code. The change effected by this 16th section, is the substitution of the commitment for trial in place of the previous commitment for examination. It is the key to unlock the meaning of this statute. It is the initial point from which the old and new proceedings diverge. And the moment the legislature decided to commit for trial and not for examination, examining courts were to be dispensed with, and not sooner. The abrogation of them, and the institution of the new mode of commitment are contemporaneous in enactment, and inseparable parts of the new law. Whenever this law was to take effect as to the commitment, it also took effect as to examining courts; and so *523 long as this law could not affect or alter the commitment for examination, its legal concomitant or incident — the examining court — was unrepealed. Upon what commitment, then, was this act of April 27,1867, designed to operate? There seems to me but one reasonable answer — upon commitments occurring on or after the day of July 1867. Any other answer would seem to involve the absurdity of conforming by way of anticipation to a law not in operation. And if it does not apply to an anterior commitment for examination, it would be incongruous and inconsistent to attribute to it a retroactive repeal of the legal consequence of such commitment in the appointment of the examining court. In conformity with this reasoning, it was very forcibly urged by Mr. Young for the Commonwealth, that chap, ceviii. in ordaining that “ trials for felony shall be in a County or Corporation court,” applied only to trials originated by, and through, this new form of commitment, and not to trials growing out of the pre-existing commitment for examination. This interpretation has certainly the merit of reconciling apparent conflicts between separate provisions of the statute, and relieving it of all possible embarrassments in its operation upon pre-existing prosecutions. I am therefore of opinion that in this view of the act we are justified in restricting its operation to cases of commitment after its commencement, and excluding therefrom pre-existing cases of commitment for examination.
H. As already intimated, there is another view of this question, which may be legitimately taken. It conducts to the same conclusion, and fortifies it, though from another aspect and by a different line of argument. It is not to be imagined, or believed, that the legislature in repealing chapter 205 of the Code, failed to contemplate or provide for the operation of such repeal upon pending prosecutions. It would scarcely consist with a proper respect for that body to suppose *524 them ignorant of the fact, that this repeal would catch criminal prosecutions in various stages- of progress, where it might be neither expedient or practicable to abandon them and adopt the new proceedings in their stead; or to accuse this body of indifference to the obvious difficulties against which it was their province to provide. They had before their eyes, in the Code they were revising in part, the general chapter of Repeal, ecxvi.,p. 861, whereby such repeal was not allowed “to affect any prosecution, suit or proceeding pending on the day of its commencement, except that the proceedings thereafter shall conform, as far as practicable, to the provisions of this act. The 4th section of chapter cexi., it is contended by petitioner’s counsel, is the only provision that was intended to be made for pending prosecutions; but its inadequacy to that end, and its failure to provide for any other cases but those pending in the Circuit courts, are conclusive to rebut and disprove this pretension. Why is it then that this act contains none of the usual provisions for preventing conflict or embarrassment naturally growing out of the substitution of a new criminal procedure in place of the old, repealed; while at the moment of the change, it must have been foreseen that prosecutions would be pending in every conceivable stage ? The answer is easy and ready; it was because there was embodied in the Code a canon of statutory construction, which directly applied to this case, and was designed to remove all such difficulties. It was designed to meet contingencies ensuing upon repeals, and superseded the necessity for future legislatures undertaking to prescribe or limit the operation of repealing laws. After its adoption in the Code, it was thenceforth to be taken as a part and limitation of every repealing statute, as much so as if it had been therein re-enacted, unless, indeed, a contrary intent should appear from the statute itself. We are therefore bound to construe the operation of *525 this repeal as governed by this prescribed rule of construction. It will be found in chapter xvi., § 18, p. 115, under the head of “ Construction of Statutes.”
I shall quote only so much of its language, as I design applying to our present enquiry, omitting for the sake of brevity and perspicuity its reference to “offences, acts, penalties, forfeitures, or punishments under the former law.” Thus abridged, it reads, “Eo new law shall be construed to repeal a former law, as to any right accrued or claim arising under the former law, or in any manner whatever to affect any right accrued or claim arising before the new law takes effect; save only that the proceedings thereafter had, shall conform, so far as practicable, to the laws in force at the time of such proceedings,” &c. This rule, however, is not to be observed, “ where such construction would be inconsistent with the manifest intent of the legislature.” It has been contended that this rule was meant to apply to cases of “ repeal by implication,” or constructive repeals; but I submit that its language is too broad and comprehensive to admit of this restricted sense. Its language embraces every “ new law,” repealing, whether in teims or by implication, a former law. Some stress is laid on the term “ construed,” as if it contemplated a case, where the fact of repeal was doubtful and therefore a matter of construction; but this restriction conflicts with the broad design of this section, which was to fix and limit the effect of repealing laws. Again, it is urged that this section served only to perpetuate the right, &c., while it changed the proceedings; but this cannot be so; for if the right were independent of, and separate from, the proceedings,-why should there be this saving of the proceedings ? The meaning evidently was, that the rights which were inherent in the proceedings should be preserved at all hazards; and the proceedings only to conform to the new law, when such change would not af *526 feet or impair these rights. The provision made in the Code, ch. 216, p. 861, § 2, for the general repeal of previous acts, throws light upon this subject, and explains the intention of the legislature. This general repeal was not thereby allowed to affect “any prosecution, suit or proceeding pending on that day, except,” &c. The Report of the Revisors (p. 75-6, and note), and the action of the legislature thereon, shows that this 18th clause of chapter xvi. was designed as a general provision to the same end, and though abbreviated, was meant to have the same operation with the limitation in the general repealing act of the Code. The history therefore of this provision, shows that it was designed, to meet the contingencies upon a change of proceedings, whether criminal or civil, so as to furnish a rule by which prosecutions or suits might proceed under a former law, though repealed, with the special saving therein stated. It is not unworthy of note, that while in other respects discarding tautologous terms from this clause, so as to render it as concise as possible, the legislature for the first time in this section enlarged the enumeration by adding “ claims” to “rights.”
I am not unaware that, in the construction of this clause, it is usual to contend for a distributive rendering of its language, so as to refer these two terms to civil suits alone. I am not prepared to assent to this, and would beg leave to express, my individual views of it, upon which my brothers express no opinion. In the first place, it is clear that the preceding enumeration of “offences, acts, penalties, forfeitures and punishments,” is not, on the other hand, to be restricted to criminal cases alone, because the terms, “ acts, penalties and forfeitures,” are referrable to many civil remedies .or proceeding. It seems to me that both classes are treated interchangeably; and the intent is ,to save from the operation of a repealing law “ the rights or claims ” of parties either in a public *527 prosecution or private suit pending under the former law, with the exception indicated. I concede that we cannot well conceive of an accused having such a right - to a particular mode of trial as to make a legislative •change thereof an ex post facto law, and therefore unconstitutional. The bare statement of such a pretension, is sufficient to refute it. This wag Perry’s case, 3 Gratt. 632, that has been, in this connexion, reliéd on by the counsel of the plaintiff in error. All that it decided was that a change in the mode of selecting venires introduced in a pending prosecution, was not ex post .facto; and that the constitutional inhibition applied to crimes and punishments and not to criminal proceedings. While this case negatives the idea of any right of the accused to any pre-existing mode of trial so as to divest the legislature of the power to alter it in consequence of the constitutional prohibition of ex post Jacto laws, it by no means goes to the extent of denying that there may be “rights or claims” of the accused that are to be preserved and respected under this rule of construction. It is one thing to assert a right for the accused by virtue of this constitutional provision; •and quite another to contend in his behalf for rights or claims secured in pre-existing proceedings by virtue of •this rule of statutory construction. The question is not whether the legislature has the power to divest such rights, but on the contrary, whether conceding the power, it has exercised it, or refrained from it by leaving them to be adjusted by the former law in spite of its repeal, and through the effect to be given by construction to the repealing law. Hence, it does not conflict with the decision in Perry’s case to hold that this 18th section preserves privileges, rights or claims arising out ■of and attached to proceedings under the former and repealed law.
How at the time of the arrest in this case, the justice was necessarily governed by the old law; he was bound *528 to conform to it. It was not for him to anticipate an enactment to take effect at a future day. It will not do to say, that by his authority to adjourn the trial for a period not exceeding- ten days, he could conveniently have passed over the expiring days of the old law. Such a device with such a purpose would have been justly reprobated, as an evasion of official duty and an abuse of official power. It was incumbent on the justice and so made by the 12th section of chap. 204, &c., to proceed “so soon as may be” with the examination of witnesses, &c.; so that, in my view, it would have been reprehensible and unjustifiable in the justice to have delayed the trial before him for any such purpose. If the old and the new law could not be dove-tailed together, and there was likely to be embarrassment or difficulty in reconciling them, one to another, it was plainly no business of the justice; the consequences, let them be what they might, rested with the law makers. He could not go out of or beyond the existing law. That required him to commit for examination. The act of the justice, then, in sending the prisoner to an examining court, was plainly regular and unexceptionable. But it seems this court convened on the 2nd of July 1867, after the repeal of the chapter authorising such a court or such a trial. How, then, was the prisoner affected by this state of things? While I do not pretend that it was incumbent- on him to assume any,, the slightest responsibility in giving a direction to his trial, I do hold that this examination was an advan- • tage or privilege to him, which in a certain event he was. allowed to waive. It was a substantial one. Besides the promptness of the trial, it was attended with this advantage, that upon his discharge by this court, “ he could never thereafter be questioned or tried for the same offence.” This view is, I need not say, predicated of the validity and legal existence of this examining court. With the advantage, however, of trial, the ae *529 cused necessarily took the chances and incurred the risk of being remanded for further trial.
In this posture of affairs, the question arises whether the abrogation by repeal of examining courts should be allowed to affect the rights or claims of the accused to such trial, arising from his commitment for examination under the former repealed law. I have already endeavored to show that, in my view, these “rights or claims” might attach to criminal as well as civil proceedings. If so, they were preserved from the operation of the repealing law. The only difficulty is, whether the claim of the accused to this preliminary examination is such a right or claim as was meant to be preserved to him by this rule of statutory construction. I am of the opinion, for the reasons already given, that it is. If then the prisoner had insisted on the 2d of July to his claim to this trial, by virtue of the former law, could it have been legally or rightfully refused to him? If the Commonwealth had chosen to disband the examining court, because annulled by the act of 27th April 1867, would it not have violated this principle of construction, and injuriously affected the claims of the prisoner ? These were grave and difficult questions. My course of reasoning has sufficiently indicated how I would have solved them. It was for the Commonwealth, without any appeal to the prisoner, or any presumption from his silence, to take her own course with his trial. She has done so; she has accorded to him the privilege of this trial, and has thus resolved whatever doubt rested upon the case in the prisoner’s favor; as she was bound to do. The case would have been different if the accused had chosen to deny the authority for this examination, and asked to be committed for trial in the County court; and in such event, doubtless, the same consideration would have dictated compliance with Ips request, and displayed the propriety of conforming the proceeding to the new law. But no *530 such step was taken hy him or his counsel; and the Commonwealth was left free to resolve whatever doubt might be alleged to exist in the matter in favor of the prisoner as she did. Hence, though my view be incorrect as to his title to this examination, it must be admitted that he has no cause to complain of the course that was taken under the circumstances. The result therefore is, that he was legally remanded to the Circuit court for trial.
But when he got there, did the requirement of conforming to the laws, then in force, demand his remitment to the County court? I will not say that his silence or acquiescence in the examining court estopped him from thereafter objecting to its jurisdiction, or the legality of his remanding. But in pronouncing upon the rightfulness of his arraignment in the Circuit court, I do insist that it is material to consider that he raised no question by habeas corpus as to the legality of his imprisonment, or before his arraignment challenged the validity of the sentence through which he reached the Circuit court. Being there then by virtue of a proceeding, the benefit of which he had, and in conformity as I think with the law as it should be construed, he was hound to answer to the indictment in that court. Had he made a demand upon the finding of the indictment to be remitted to the County court for trial, the question would have arisen whether the proceeding could be so far conformed at that stage to the new law. But he made no such demand. It seems on the contrary, from the character of the plea, that the prisoner’s counsel avoided the averment of any wish or demand on his behalf for a trial in the County court. Perhaps it may have been inconvenient to distinctly prefer such a demand, as, it might be foreseen, it would most probably have been soon followed, if granted, by a return on his motion to the same court for final trial. Therefore the silence of the record on this point de *531 notes no little forensic strategy, of which, none can complain, or refuse to allow the prisoner the benefit, if any can be derived from it. But it was the province of the judge to forecast and to avoid, if proper, any unseemly shifting of the judicial scenes. The duty of conforming to the laws then in force pertained to his judicial discretion, into the proper exercise whereof it is, however, our business to enquire. The existence of such discretion is sufficiently indicated by the express qualification, “so far as practicable.” If the Circuit court were rightfully in possession of the case, where the propriety or necessity of sending it back? As the prisoner had the benefit of the examining court, without any challenge of its validity or authority, it was in consequence thereof he was triable before the Circuit court; and in that sense it was not practicable to conform to the new law in this particular.
But it is said that it was incumbent upon the court, under the 16th section of chapter 207; of this late act to “ certify the indictment as soon as found to the Court of the county in which the offence is charged to have been committed.”
Without pausing to solve the doubts that have been suggested upon the construction of this section, it is sufficient to say, that it does not embrace all cases. For instance, it is obviously qualified by the 4th section of ch. 211, retaining for trial in the Circuit court, pending prosecutions for capital felonies. We must, therefore, construe this provision in connectiou with other parts and the general frame of the act, from which I infer it does not embrace a case like this emanating from an examining court, and thus being a proceeding protected from the operation of the repeal. Had this examination transpired in June, the case would thereafter have been pending in the Circuit court, and as such, not liable to the operation of the 16th section. The examining court upon remanding was functus officio; *532 and the case must thereafter have been in the Circuit court, to which it was remanded, unless indeed there he some sort of judicial limbo for the receptacle of such cases. This then would have been a case, where this; direction broad as its language is, would not have applied because of its conflict with the required trial in the Circuit court. By parity of reasoning it should not he construed as applicable wherever the Circuit court is authorized to try. Besides, I have endeavored to show that it is quite immaterial in what stage the repeal should happen to catch the proceedings upon a commitment for examination. They are, thenceforth,, to follow the old law, except so far as the court shall find it pi’acticable to conform them to the new.
Further it has been asked, what function does the 4th section of chap. 211, respecting prosecutionspending in the Circuit court, perform: or is it not superfluous, if this rule of construction is to have the effect attributed to it ? There is another and distinct operation for this section; it is by no means superfluous. The first part of it, confers in cases of misdemeanors,. &c., a discretion to try, &c., and the concluding sentence, if not used ex abundanti cautela, has the effect and was so designed, to take prosecutions for capital felonies out of the saving of the 18th section of chap. xvi. of the Code; so as to relieve the court of any necessity of seeking to conform the proceedings to the new law. Besides, it has been séeii that this 4th section of chap. 211, of the late act, is "limited to the Circuit courts; whereas, this statutory construction has a wider scope and embraces proceedings elsewhere.
From this two-fold consideration of this question of jurisdiction, I feel warranted in. concluding that the Circuit court, to wh'ich the prisoner had been remanded for trial, had jurisdiction to try his case, notwithstanding the repeal of examining courts by the late act.
I have thus endeavored to dispose of the only ques *533 -tion brought up to us as a matter of pleading from the* record of the first trial, which owing to the disagreement of the jury, was a mistrial. I come now to con- - -sider the only remaining assignment of error upon the record of the second trial, which eventuated in conviction and sentence. This grows out of the seventh and last bill of exceptions to the refusal of the court to grant a new trial for irregularity in the treatment of ■the jury; and for a separation of the jury. The separation consisted in this, that the judge having allowed a sick j uror accompanied by a sheriff, to leave the rest of the jury and sit upon the portico of the hotel, where the judge joined them, and soon sent the sheriff back to the jury room, saying he would take charge of the juror; and that accordingly the judge in some few minutes accompanied and saw the juror back to the jury room and delivered him over to the sheriff. I presume the charge of “ irregularity in the treatment of the jury” is limited to this temporary custody of the juror which the judge assumed; and has no reference to the frequent kind and considerate visits he made to the jury-room, in the presence of the sheriffs, to look after the comfort of the jury, enquire after the sick, and accompany physicians who were called in to their treatment. Such attentions were altogether proper, and have not been challenged, in the argument of the counsel for the plaintiff in error; so that in view of the generality of the charge and the evidence on this point in the record, it is proper to state that this objection of irregularity is confined, as I understand it, to the temporary charge which the judge under the circumstances took of the juror.
This brings me to consider what are the powers and duties of a judge respecting a jury in a criminal cause under trial before him, both in and out of court. It is his appropriate function to preside over the jury while ■empanneled in court. He literally has the custody and *534 -oversight of them while. sitting, and has no need of a-sheriff save to attend a juryman, who may be called off, or to conduct the jury to their room. So when he 2eaves bench for a recess during the day, it is not nsu^’ I believe, to swear the sheriffs in charge of them, because in contemplation of the law, the court is still in session; there is no record made of the adjournment; and the jury is still under the charge and supervision of the judge. The whole term is in like contemplation of law but one day; and if it were possible to hold a continuous session, there would be no' necessity of confiding the jury to any one but the judge. He is the high and responsible functionary entrusted with the conduct of criminal trials, and bound to preserve the purity of jury trial and place it beyond suspicion of all improper interference. It would be well for the protection of prisoners and the behaviour of juries if it were possible for the judge to keep them. Instead of its being said, he is the last man who should have charge of a jury, he is the first and best, and the very one to whom the charge is confided by law. But it is not possible for him to discharge the functions at all times; hence, has grown up the custom of committing the jury on the adjournment of the court for the day, to the sheriff sworn to “ keep them, and neither speak to them nor suffer any other person to speak to them touching any matter relative to the trial unti^ they return into court.” By whom are they thus committed? assuredly, by the judge, “with the consent of the prisoner and for reasons appearing to the court.”' At all times, in and out of court, the judge is constructively presiding over the jury and protecting their deliberations from all improper influence. Ho one but he, has charge of them in court; and upon adjournment, it is his order by which they are committed for the night or interval between the adjournment and sitting, to the sheriff; ■ and it is by his authority the oath *535 is required of the officer who is to keep them. It is only from the necessity of the case and the fitness of things they are taken from him during the adjournment of his court. From this theory of his office in jury trials, it can scarcely be that his oversight and superintendence are suspended hy the adjournment of the court. He has many legitimate modes while in session, through instructions and charges to influence their finding, but no semblance of authority to approach them corruptly; so in his recess, he can have his eye upon them and exert a superintendence over them and their custodians so as to maintain the purity of the trial and the sanctity of their deliberations; but by no means to tamper with their verdict or seek privately to influence them. The possibility that such abominable practices may occur on or off the bench, cannot be accepted as a reason for doubting or impairing the authority which the law gives a judge for quite a different purpose, namely, to advance rather than pervert the course of justice. I am, therefore, of opinion that it is in the competency of a judge out of court as necessity or occasion may require, to direct, superintend and charge jurymen and other officers of the court in matters pertaining to their official conduct and behavior out of court; so that a disobedience of his lawful commands, in such respect, would be an obstruction to the business of the court, and a contempt thereof. ISTor is there anything in the decisions of this court that, have been quoted to that end, calculated, when rightly considered, to impugn this position. These views are sustained and strongly presented in a case from Wisconsin (Barrett v. State, &c., 1 Wisc. R. 181), which I quote not as authority, but for its apposite reasoning on this point. The question was, whether the court having adjourned to the next day, the judge upon being informed at night by the sheriff that the jury had agreed, could resume the business of the court, and re *536 eeive the verdict in open court, in the usual presence of the prisoner, &c., hut in the absence of his counsel during the night of such recess. It was decided that ^ cou],j. anc]i p now qU0^e a passage from the opinion this case and corroborative of my position. “ For all general purposes, the court is considered in session from the commencement till the close of the term. The jurors, officers and parties, are all under its direction. To hold that an adjournment for refreshment suspends the functions of the court during the term of such adjournment, would be to open the door to a multitude of evil practices, and to throw off all those salutary restraints which have been found necessary to the due and solemn administration of justice. Even in this case, the jury were as much under the control and protection of the court after its adjournment for the night as they were before it. It was the authority of the court, which kept them together; and that authority continued from the time they were empanneled till they were discharged; as much during the recess as during the active labors of the court. Suppose between the hours of seven and eleven o’clock of the evening of the 30th of March, the room in which the jury were deliberating had been surrounded by rioters or tumultuous persons for the purpose of influencing their deliberations, or of interrupting their discussions, would not such persons be punishable for contempt of court? Yet they could not be guilty of contempt if the functions of the court were altogether suspended.”
From this reasoning, which I fully sanction, I infer with much confidence, that upon any emergency or occasion occurring out of court, whereby the judge is properly or by necessity left in charge of a juror without the presence of the sheriff, it is within his official province to take such charge; and that the propriety of *537 Ms conduct in tMs instance, as in others, is to he determined by the evidence.
Let us now apply this view of the law to the actual conduct of the judge, which is impeached in this case. The trial was a very protracted one. The jury was empanneled on the 23d day of June, and not discharged till the 9th day of July. It was composed of men drawn from distant homes, many of whom fell sick during the progress of the trial. The evidence upon the application for a change of, venue, shows that they were surrounded by a population whose minds were inflamed against the prisoner. There had already been one mistrial. There was every thing, therefore, in the situation of the judge, presiding over such a trial, to admonish him to unusual vigilance in watching over the health and comfort of the jury, and to repeat his cautions to the sheriffs to keep the jury together, and guard them against all extraneous influences, or the slightest impropriety of behaviour. Hence, the interests of the Commonwealth and the prisoner, the cause of justice, and his own sense of convenience and duty, all conspired in requiring of the judge in this remarkable trial the frequent precautions he took in visiting and enquiring after the sick jurors, and enjoining on the sheriffs the utmost strictness and care in guarding them while out of court. This was highly commendable and natural. It has no semblance of a hangingabout the jury room to pry into their deliberations, or drop some guilty whisper to influence their verdict.
The consideration of these circumstances also serves to explain and justify the conduct of the judge in this instance. "When in pursuance of the indulgence given the sick juror, the judge found him with the sheriff on the public portico of the hotel where others were sitting, he takes a seat by them as if by his presence to keep off intruders and prevent all improper approach. *538 0r in'*:er:ference with juror. But after the two sheriffs keeping the jury, had withdrawn from the jury room and left a part of them locked up, the judge’s solicitude for their wants or careful custody, was again arouse<^> an^ -^e directs the sheriff sitting with him and the sick juror, to go back to the jury room, and he would take charge of the sick juror. I cannot think that for this object and with this motive, the judge was thereby out of the line of his official duties, or usurping any authority that did not belong to him out of court. The case would be very different if this were corruptly contrived to gain the opportunity of conversing with the juror upon the subject of the trial: but when it is not pretended or suspected that such was the case, and that nothing transpired in the interview to raise the slightest conjecture of the sort, his momentary charge of the juror was a matter of strict propriety and necessity. Far distant be the evil day, when corruption shall have so soiled the bench and tainted the streams of justice as that the accidental or necessary presence of the judge with a juror shall not be received as a fair presumption that no wrong was done or permitted, but on the contrary, shall be accepted as. proof of tampering! When that state of opinion shall prevail, all respect for the courts, all confidence in the administration of justice, all reverence for authority will have forsaken that department of the public service, usually deemed the last and best bulwark of public virtue and morals.
But it is said to be dangerous to confide to a judge such power and discretion, so’ liable to be perverted to the pollution of jury trial. This, however, is true of all discretionary power. I cannot better express my view than in the language of a recent case in the Queen’s Bench, (Winser v. The Queen, 1 Law Rept’s Q. B. 309), upon the authority of the judge on a trial of felony, under certain circumstances, to discharge a jury *539 for disagreement, &c. Sir Alexander Cockburn, O. J., said: “I agree that our rules are to be framed to keep the administration of justice beyond the possibility of corruption. On the contrary, if a rule is essential for the convenient working of the administration of justice, we must trust to the honesty of those to whom we commit that most important department of the State. We must trust to the means we have of punishing corruption and dishonesty if we find it operating on the minds of our judicial officers. I cannot help thinking that this discretion is of a very useful and salutary character. We must trust it will never be abused, or if unhappily it should be abused, we must trust to the power of parliament and the executive for punishing the judge who would act so dishonestly and corruptly.”
It is proper to take some notice of the cases that are supposed to show that the judge has not the power out of court, which the view I have taken ascribes to him. These cases are Sargent v. Roberts, 1 Pick. R. 337; Fish & another v. Smith, 12 Indi. R. 563; and Crabtree v. Hazenbaugh, 23 Ill. R. 349. The first was a case of a virtual instruction sent in the form of a letter by the judge to the jury in the recess; the second, of the judge visiting the jury in their room and giving them instructions in the absence of the parties and without their consent; and the third, of a judge, who upon being sent for by the jury, repaired to their room, and declined, when asked, to explain the meaning of his written instructions. The true principle of these decisions, is thus expressed by Oaton, O. J. in the last case: “ the policy of the law requires that all the proceedings of the court should be open and notorious and in the presence of the party, so that if he is not satisfied with it he may take exceptions to it in the mode pointed out in the law; and not be put to extra *540 neons proof to show that an error had been committed in- a secret proceeding and in fact out of court.” These cases do not, therefore, at all militate against the view I have taken of this ease.
But suppose I am wrong in this view of the judge’s authority out o'f court over his officers and jurors, and that we are to consider this case as one purely of the separation of the jury, and as if the juror had been left with some other person but the judge presiding over the trial. Upon this question, there are a great number of eases abroad, and in the States of the Union. Their name is “legion;” and we are indebted to the research and industry of counsel for a particular reference to them. I cannot be expected to review them. I am more particularly interested in the state of our own adjudications, so that I may not run counter to them, or unsettle the law with us. If it be conceded to the counsel for plaintiff in error that McCaul’s case, 1 Va. Cas. 271; and Overbee’s case, 1 Rob. R. 756, are authority for their position that Separation per se vitiates a vedict in a criminal cause, it must be allowed that Martin’s case, 2 Leigh 745; McCarter’s case, 11 Leigh 633, and Thompson’s case, 8 Gratt. 637, are to the contrary. I do not interpret Wormley’s case, 8 Gratt. 712, as settling, as it is contended, this conflict of authority. There is no reference to the prior cases, and it is manifest that that case was decided on the misconduct of the sheriff, which is specially animadverted upon, and censured. La this unsettled and indeterminate condition of our cases, I think we are authorized to deduce and lay down a rule not in conflict with them, as a whole; and in harmony with the general current of decisions elsewhere. And that rule seems to me to be this: that separation out of the custody and control of the officer is prima facie sufficient to vitiate a verdict; and that it is incumbent upon the Common *541 wealth to refute that presumption by disproving all probabilities or suspicions of tampering; unless, indeed, the prisoner’s own testimony, as in Thompson’s case, should be sufficient to that end. This principle, I think, reconciles our own cases, and comports with the general current of the cases to which we have been referred. It is an ample safeguard of the purity of jury trial, for which I entertain habitual reverence; and I do not think we thereby impair the weight to be attached to our earlier decisions.
In the application of this principle to the case at bar, I do not think there is a rational doubt that the Commonwealth has by the testimony of the juror and sheriffs most satisfactorily repelled any, the slightest presumption of unfairness or tampering in the transient interview of the judge with the sick juror; and, indeed, the counsel of the plaintiff in error distinctly disclaimed any suspicion of it. On the contrary, the complaint is of the separation by itself, and the danger of such a precedent. It is also alleged that there is a peculiar hardship in this case, as the judge is required to pronounce on his own conduct. This, however, is not so. It would be the same if the judge were to misbehave towards the jury in open court, as by instructing them on the weight of testimony, or indecorously betraying to them his leaning in the cause.
This case has been argued at great length, and with eminent ability. I have not been able to notice all the points of the argument, or comment upon the many pertinent authorities that have been laid before us. I desire to acknowledge my obligations to counsel for their researches, and the benefit I have derived from their arguments. It is not that I slight either the one or the other, that I do not specially notice them; but because they lay outside of the immediate discussions that I have been pursuing, and apart from the view that I have been led to take of this case.
*542 It only remains for me to announce my opinion that this record does not furnish ground sufficient to set aside the verdict and award the new trial asked for.
The other judges concurred in the opinión of Rives, J.
Judgment aeeirmed.